

# NUMBER 13-25-00179-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

BURLINGTON RESOURCES OIL
& GAS COMPANY LP,                                               Appellant,

v.

TEXAS CRUDE ENERGY,
LLC, ET AL.                                                     Appellees.

## ON APPEAL FROM THE 156TH DISTRICT COURT
## OF LIVE OAK COUNTY, TEXAS

# MEMORANDUM OPINION

**Before Chief Justice Tijerina and Justices Peña and West
Memorandum Opinion by Chief Justice Tijerina**

Appellant/cross-appellee Burlington Resources Oil & Gas Company, LP (Burlington) appeals the trial court's rendition of discovery sanctions against it. By two issues, Burlington argues the trial court abused its discretion in imposing sanctions under Texas Rule of Civil Procedure 215 because: (1) all discovery was stayed by agreement

and court order, no party served discovery requests, and no motion to compel had been filed or granted; and (2) appellees/cross-appellants Texas Crude Energy, LLC, (Crude) and Amber Harvest (Amber) failed to demonstrate a causal connection between any alleged discovery abuse and the sanction award.

By two issues, appellees/cross-appellants argue the trial court erred in granting Burlington's motion for summary judgment because Burlington failed to adhere to Texas Rule of Civil Procedure 166a(i) by not stating the elements of appellees' claim for which Burlington alleged there was no evidence. Appellees further argue Burlington was not entitled to deduct deficiency fees it chose to incur from overriding royalty interest (ORRI) payments to Amber when three transportation agreements and a supply agreement failed to prove that said deficiency fees were costs incurred by Burlington to transport or sell oil in which appellees owned an ORRI. We reverse and render in part and affirm in part.

## I. BACKGROUND

Texas Crude owns ORRIs in oil and gas leases operated by Burlington, and Amber is an affiliate of Texas Crude pursuant to a Prospect Development Agreement (PDA) and Joint Operating Agreement (JOA). These agreements do not contain limiting language on post-product costs (PCCs). Crude assigned its ORRI to Amber. For nine years, Burlington calculated royalty payouts by subtracting the royalty owner's proportionate share of PPCs incurred between the wellhead and the point of sale.

## A. Original Suit

In appellees live petition filed on January 15, 2015, they alleged that in calculating and making ORRI payments to Amber, Burlington was improperly deducting PPCs from proceeds it was receiving from the downstream sale of Amber's production and was thus

2

underpaying appellees. Burlington contended that the PDA and JOA required the royalty holder to bear its share of PPCs.

The parties filed competing motions for summary judgment on appellees' PPCs claim. The trial court interpreted the PDA and JOA in appellees' favor, concluding that the PDA and JOA did not permit Burlington to deduct PPCs when calculating royalty payments.[1] In a permissive appeal, this Court affirmed. *Burlington Res. Oil & Gas Co. LP v. Tex. Crude Energy, LLC*, 516 S.W.3d 638, 647 (Tex. App.—Corpus Christi–Edinburg 2017), *rev'd*, 573 S.W.3d 198 (Tex. 2019). However, the Supreme Court of Texas held that the ORRI assignments "permit Burlington to charge Texas Crude its proportionate share of post-production expenses when calculating royalty payments" and reversed and remanded the cause to the trial court to determine the amount of PPCs that could be deducted. *Burlington Res. Oil & Gas Co. LP v. Tex. Crude Energy, LLC*, 573 S.W.3d 198, 212 (Tex. 2019).

## B.    Remand

On remand, the parties executed an agreement on July 12, 2021, to stay litigation for appellees to audit the royalty payments Burlington made for the ORRIs from first production through December 2020 as well as royalty payments made for the ORRIs every two years thereafter. On April 25, 2022, appellees' auditors informed appellees that Burlington had not furnished information necessary for the completion of the audit. On July 18, 2022, Burlington informed the auditors that the information it provided was sufficient to complete an audit.

On March 14, 2023, appellees filed a "Motion for Production of Information Needed

---

[1] The trial court did not address other claims and causes of action and only addressed the PPC issue.

3

for Completion of Audit," requesting that the trial court compel Burlington to furnish specific information necessary for appellees to complete an audit. On March 30, 2023, Burlington responded, stating appellees had sufficient information to identify what PPCs Burlington deducted from their royalty payments. Burlington further stated the requested documents do not exist and would be extraordinarily costly for Burlington to create. Appellees responded, complaining that Burlington had not provided "sufficient information and documentation regarding the volumes of crude oil/condensate" "natural gas liquids . . . at applicable [PPC] points during the audit period—including the points of sale—that enable [appellees] to verify the allocation of PPCs that Burlington deducted" from the ORRI payments.

On June 20, 2024, appellees filed a motion to recover fees and expenses under Texas Rule of Civil Procedure 215, alleging Burlington's reluctance to supply it with necessary information resulted in appellees incurring substantial and unnecessary fees and expenses under Rule 215.1(d). Appellees further requested sanctions pursuant to Rule 215.3 "as a result of Burlington's abuse of discovery."

On August 19, 2024, Burlington responded, stating: appellees did not submit a proper request under Rule 215 because all discovery was stayed; the parties have not engaged in discovery since 2021; appellees' motion references a motion to compel which the trial court had not ordered Burlington to produce; Burlington had supplied appellees with information for audit purposes; and there was no causal connection between the hundreds of hours their attorneys and consultants billed Burlington. Thereafter, Burlington continued to object to appellees' request for fees and expenses and sanctions.

On August 21, 2024, Burlington filed a motion to lift the stay, and on August 26,

2024, the trial court held a hearing on appellees' motion for recovery of fees, expenses, and sanctions and lifted the stay.

## C. Current Suit

On November 13, 2024, appellees amended their petition, stating that Burlington underpaid Amber when making ORRI payments because it improperly deducted "deficiency fees incurred by Burlington" in "the range of $75,000" pursuant to four specific transportation agreements: Pipeline and Terminal Servies Agreement between ConocoPhillipps (CP)[2] and NuStar Logistics; Master Throughput Agreement between CP and JAG Tanking of Texas; Crude Oil Ingleside Terminal Throughput Agreement between CP and Flint Hills Resources Corpus Christi; and a Crude Oil Supply Agreement between CP and BP Products.

Following a hearing, on November 20, 2024, the trial court granted appellees' motion for the recovery of fees and expenses, finding that Burlington abused the discovery process. The trial court further awarded appellees attorney's fees in the amount of $239,003 and expenses in the amount of $48,312.

On January 10, 2025, Burlington filed a motion for summary judgment on the legal question of whether it properly deducted PPCs pursuant to the *Burlington* court's directive. It argued that it incurred deficiency fees in "transporting oil produced from the wells in which Amber Harvest has an ORRI to the downstream location at which Burlington sold the oil," and these fees are precisely the type of PPCs the *Burlington* court ruled that Burlington could deduct. It attached several exhibits in support of its motion and requested that appellees' claims against it be dismissed. Appellees responded stating

---

[2] Burlington is a subsidiary of ConocoPhillips.

5

that Burlington is not authorized to deduct deficiency fees for transportation not actually used to transport raw gas or oil. In other words, the deficiency fees that Burlington incurred were not related to the actual product that was produced, transported, or sold.

The trial court granted Burlington's motion for summary judgment and dismissed appellees' claims against it. This appeal followed.

## II. RULE 215

Burlington argues that the trial court abused its discretion when it awarded appellees attorney's fees and expenses under Rule 215.1(d) and 215.3 because "there was no discovery abuse" as the parties agreed to halt discovery.

### A. Applicable Law & Standard of Review

Texas Rule of Civil Procedure 215.1, entitled, "Motion for Sanctions or Order Compelling Discovery" states that a party may apply for sanctions or an order compelling discovery. TEX. R. CIV. P. 215.1. When an order under this section is granted, the trial court shall require an offending party to pay the moving party's "reasonable expenses incurred in obtaining the order, including attorney fees." *Id.* R. 215.1(d). Rule 215.3, entitled, "Abuse of Discovery Process in Seeking, Making, or Resisting Discovery" states that if a court finds that "any interrogatory or request for inspection or production . . . or that a response or answer is unreasonably frivolous or made for the purpose of delay," then the court may impose an appropriate sanction. *Id.* R. 215.3.

"A trial court's ruling on a motion for sanctions is reviewed under an abuse of discretion standard." *Cire v. Cummings*, 134 S.W.3d 835, 838 (Tex. 2004). A trial court abuses its discretion when it acts "without reference to any guiding rules or principles."

6

*Id.* at 839. A trial court's ruling will be reversed only if it is arbitrary or unreasonable. *Id.*

**B.      Discussion**

In this case, appellees sought attorney's fees and expenses pursuant to Rules 215.3 and 215.1(d). However, both Rules apply to the discovery process, which the trial court stayed here. While Rule 215.3 applies to a party abusing the discovery process, Rule 215.1 addresses when a party fails to fulfill discovery obligations. *Compare* TEX. R. CIV. P. 215.3 *with id.* Rule 215.1(d). It is undisputed that the parties did not engage in discovery when appellees filed their motion for fees and expenses. Rather, the parties agreed to "suspend all discovery and other proceedings in the lawsuit" and requested that the trial court "[s]tay all discovery and other proceedings" until: (1) the parties notified the trial court that the claims have been resolved, or (2) the parties requested that the trial court lift the stay. The trial court complied with this request. Although the trial court suspended discovery, the trial court's order awarding fees and expenses found that "*Discovery Abuse* was not justified" and that "the award of Attorney Fees and Expenses related to said *Discovery Abuse* are warranted and supported by the evidence." (Emphasis added). However, Rule 215—applicable to the discovery process—cannot be applied in this case where the parties requested, and the trial court granted, a stay of the discovery process. *See TransAmerican Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991) ("[A] just sanction must be directed against the abuse . . . ."). Accordingly, we conclude the trial court's award of expenses and attorney's fees was arbitrary and unreasonable, finding that Burlington abused the discovery process after the trial court stayed discovery. We reverse the trial court's order granting appellees' sanctions motion and awarding attorney's fees and expenses, and we render judgment that appellees take

7

nothing.

<h3 style="text-align:center">III.    SUMMARY JUDGMENT</h3>

By their sole issue, appellees argue that the trial court erred by granting summary judgment in favor of Burlington because Burlington is not "legally entitled to deduct from [ORRIs]. . . deficiency fees Burlington chose to incur under the [transportation and supply] agreement[s]. . . when these agreements and the other evidence . . . do not prove that such deficiency fees were costs incurred by Burlington to transport or sell oil in which [appellees] own an [ORRI]."

## A.    Standard of Review

"A party seeking summary judgment may combine in a single motion a request for summary judgment under the no-evidence standard with a request for summary judgment as a matter of law." *Tex. A&M Concrete, LLC v. Brae Burn Constr. Co.,* , 651 S.W.3d 607, 617 (Tex. App.—Houston [1st Dist.] 2022, no pet.). In such a case, "we may review a summary judgment under the matter-of-law standard first if it would be dispositive." *Id.* To prevail on a traditional summary judgment, a movant has the burden of establishing that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(h)(2). We view the evidence "in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)).

## B.    Applicable Law from the *Burlington* Court

"[O]il and gas royalty interests are free of production expenses but usually subject

to [PPCs], including taxes . . . and transportation costs." *Burlington*, 573 S.W.3d at 203 (citation modified). The term PPCs "applies to processing, compression, transportation, and other costs expended to prepare raw oil or gas for sale at a downstream location." *Id.* After PPCs have been expended, the product's value is enhanced, making it more valuable than straight out of the well. *Id.* Thus, royalties on products at their downstream point of sale are more valuable than royalties on the same products at the well. *Id.* The *Burlington* court held that the relevant granting clauses in the PDA and JOA gave Burlington the right to subtract PPCs from the amount realized in downstream sales prices to calculate the product's value as it flows into the pipeline, tanks, or other receptacles.[3] *Id.* at 211.

## C.    Discussion

In its motion for summary judgment, Burlington asserted that it complied with the parties' PDA and JOA and deducted only those PPCs as permitted by the JOA and PDA, including deficiency fees. According to Burlington, it incurred those fees in "transporting oil produced from the wells in which [appellees have] an [ORRI] to the downstream location at which Burlington sold the oil." Burlington argued these fees are "precisely" the

---

[3] Granting Clause: Said overriding royalty interests shall be delivered to ASSIGNEE into the pipelines, tanks or other receptacles with which the wells may be connected, free and clear of all development, operating, production and other costs.

Valuation Clause: The overriding royalty interest share of production shall be delivered to ASSIGNEE or to its credit into the pipeline, tank or other receptacle to which any well or wells on such lands may be connected, free and clear of all royalties and all other burdens and all costs and expenses except the taxes thereon or attributable thereto, or ASSIGNOR, at ASSIGNEE's election, shall pay to ASSIGNEE, for ASSIGNEE's overriding royalty oil, gas or other minerals, the applicable percentage of the value of the oil, gas or other minerals, as applicable, produced and saved under the leases.

9

type of PPCs the *Burlington* court ruled that it could deduct. Appellees argue that said deficiency fees incurred by Burlington cannot be deducted or otherwise reduce the amount of ORRIs payable to Amber. Burlington attached the transportation and supply agreements and affidavits; appellees did not attach evidence.

### 1. John Saltsman Affidavit

In his affidavit, John Saltsman declared that he is employed by CP and is currently a supervisor of the group that handles "fee royalty and severance tax audits and litigation support." He stated that CP entered into transportation and terminal service agreements with Flint Hills, JAG, and NuStar to "secure transportation of the oil produced from the Sugarloaf Wells to a downstream point of sale." CP then sold the oil it produced from the Sugarloaf Wells to BP Products pursuant to the supply agreement. Saltsman explained that when CP uses the transportation services described in the transportation agreements, it incurs a transportation expense. This expense may be described as a "deficiency" fee depending on the volume of production transported. The amount that CP agreed to pay each service provider is set forth in each transportation agreement and calculated using the minimum volume commitments described therein. At minimum, CP pays a "transportation cost in order to transport oil" from the Sugarloaf Wells under each transportation agreement.

Additionally, Saltsman stated that the supply agreement provides pricing structures, which includes an adjustment or deficiency fee that reduces the proceeds BP Products pays CP for oil sold to BP Products. Under the supply agreement, when CP sells oil produced from the Sugarloaf Wells, the proceeds that CP receives from BP Products are part of a "weighted average price calculation for oil produced from the

Sugarloaf Wells." Thus, "in time periods where the deficiency fee reduced proceeds that [CP] received from BP [Products] for oil produced from the Sugarloaf Wells, those reduced proceeds were part of the downstream weighted average sales price for oil produced from the Sugarloaf Wells." Saltsman described the calculation price as follows: the downstream weighted average sales price for oil produced from the Sugarloaf Wells minus the weighted average transportation costs incurred for oil produced from the Sugarloaf wells prior to downstream sales locations at which the Sugarloaf Well oil is sold.

### 2. Angela Paslay Affidavit

Angela Paslay stated that she is certified public accountant with over thirty years of experience in oil and gas revenue accounting. According to Paslay and her review of the transportation agreements, NuStar, JAG, and Flint Hills agreed to provide CP with terminal throughput services for crude oil and condensate produced from CP from the Sugarloaf Wells. In exchange, CP agreed "to pay a per-barrel throughput fee associated with a minimum daily throughput volume" at each of their respective facilities pursuant to specific terms of each respective agreement. If CP delivers less than the minimum daily throughput volume, CP must still pay the full terminal service throughput costs based on the minimum volume. The transportation agreements account for this as the "deficiency fee." Paslay stated: "Whether [CP] delivers the full minimum volume or delivers less than the full minimum volume, the full terminal service throughput costs, including the portion that may be charged as deficiency fees, were incurred for the purpose of transporting the actual produced and delivered volumes to [CP's] points of sale." In other words, pursuant to the transportation agreements, the deficiency fees—like the full minimum volume fees—are considered regular necessary transportation expenses because it incurred

11

these transportation costs to transport oil from the Sugarloaf Wells.

Paslay explained that terminal throughput services are a form of transportation service that moves hydrocarbons from an upstream point to a downstream point. Relevant to the transportation agreements here, terminal throughput services occur downstream at the Sugarloaf Wells and upstream of the point at which CP sells the product. In the oil and gas industry, this service is considered a PPC. Paslay stated that CP correctly accounts for the full terminal service, including deficiency fees, as PPCs in its accounting system, and this "is the proper and widely-accepted accounting treatment" for these PPCs.

### 3.    Analysis

There is virtually no judicial authority discussing, much less meaningfully analyzing deficiency fees, and the parties point to no judicial decision interpreting "deficiency fees." *See Comm'r of Gen. Land Off. of State v. SandRidge Energy, Inc.*, 454 S.W.3d 603, 621 (Tex. App.—El Paso 2014, pet. denied) (stating the same for "firm transportation charges"). Thus, we heed similar commentaries as did the *Burlington* court when that court analyzed the interpretation of the phrase "into the pipeline" between the parties' PDA and JOA.[4] Under the *Manual of Oil and Gas Terms*, "transportation costs" are defined as "the costs of transporting oil or gas to a market." 8 HOWARD R. WILLIAMS &

---

[4] "In interpreting unambiguous mineral-interest deeds and contracts, we sometimes refer to treatises and other scholarly sources that provide views on the meaning of technical terms or terms commonly used by the industry." *Burlington Res. Oil & Gas Co. LP v. Tex. Crude Energy, LLC*, 573 S.W.3d 198, 207 n.8 (Tex. 2019).

The *Burlington* court noted that "several authors familiar with industry practices" agreed with Burlington that "into the pipeline" contemplated valuation at the well and therefore authorized deduction of PPCs. *Burlington*, 573 S.W.3d at 207 (citing 3 HOWARD R. WILLIAMS & CHARLES J. MYERS, OIL AND GAS LAW § 646.2 (Patrick H. Martin & Bruce M. Kramer, eds., 2018)); *see also* 3 EUGENE KUNTZ, TREATISE ON THE LAW OF OIL AND GAS § 40.5(a) (1989); A. W. Walker, Jr., *Nature of the Property Interests Created by an Oil and Gas Lease in Texas*, 10 Tex. L. Rev. 291, 313 (1932).

CHARLES J. MEYERS, OIL AND GAS LAW, *Transportation Costs* 60 (Patrick H. Martin & Bruce M. Kramer eds., 2026). While "[a]n occasional lease may provide . . . that the lessor shall receive his royalty free and clear of expenses at the well *or other delivery point*," royalty owners "must normally share in the expenses of transporting the product to market." *Id.* The treatise provides that expenses shared by operator and nonoperator include "[t]ransportation charges or other expenses incurred in conveying the minerals produced from the well-head to the place where a buyer of the minerals takes possession thereof." 3 HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL AND GAS LAW, § 645.2 (Patrick H. martin & Bruce M. Kramer, eds., 2026). "Nonoperating interests usually bear a proportionate share of transportation costs, in the absence of an express agreement to the contrary." *Id.*

Here, the uncontroverted evidence provides that under the transportation agreement, CP was *required* to pay the minimum transportation cost, and without CP's commitment to pay these deficiency fees, CP would be unable to utilize the throughput services under the transportation agreements to secure firm, reliable service for anticipated production from the Sugarloaf Wells in which appellees own an ORRI. Appellees did not submit evidence to refute this but argued that the deficiency fees were not transportation costs and were thus not deductible because they were not incurred by Burlington to transport oil from the Sugarloaf Wells to the downstream sales location. We disagree. As stated by Paslay and Saltsman and as provided by the transportation and supply agreements, the deficiency fee is an actual cost "of transporting oil or gas to a market" paid by Burlington to transport oil from the Sugarloaf Wells. *See* 8 HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL AND GAS LAW, *Transportation Costs* 60 (Patrick H.

Martin & Bruce M. Kramer eds., 2026). The entirety of the fee that Burlington paid—regardless of whether the fee is labeled deficiency or throughput—is a transportation expense because without payment of the fee, Burlington would be unable to transport the oil produced from the Sugarloaf Wells. Similarly, the supply agreement provided that Burlington incurred another penalty whenever it sold product from the Sugarloaf Wells to BP Products: if Burlington did not sell the minimum agreed-upon amount, BP Products reduced Burlington's sale proceeds. In turn, Burlington included this deficiency fee in its downstream weighted average sales price.

Thus, we conclude that the deficiency fees deducted by Burlington pursuant to the transportation and supply agreements constitute transportation costs, which are deductible as PPCs, because Burlington incurred—and paid—these fees to the transportation provider to transport and deliver product from the Sugarloaf Wells to the downstream sales point and incurred this fee from BP Products. *See Comm'r of Gen. Land Off. of State*, 454 S.W.3d at 622 ("The issue is not whether firm transportation charges[5] qualify generally as transportation costs. They clearly do."). Accordingly, the trial court did not err in rendering summary judgment in favor of Burlington on the issue of PPCs. We overrule appellees' issue.

## IV. CONCLUSION

We reverse the trial court's order granting appellees' motion for recovery of fees and expenses and awarding fees and expenses, and we render judgment denying that motion. We affirm the trial court's granting of Burlington's motion for summary judgment

---

[5] A firm transportation charge is an upfront reservation fee a gas producer pays to a pipeline owner in order to secure future space in the pipeline for the delivery of its gas to distant markets. *Comm'r of Gen. Land Off. of State v. SandRidge Energy, Inc.*, 454 S.W.3d 603, 621 (Tex. App.—El Paso 2014, pet. denied).

14

dismissing appellees' claims against it.

JAIME TIJERINA
Chief Justice

Delivered and filed on the
6th day of August, 2026.